IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STEVEN JAMES HOFFMANN,

Plaintiff,

v.

LIEUTENANT WADE SCHLICHTING, SARAH A. BUELOW-MILLER (personal representative for the Estate of Samuel J. Miller), OFFICER ANTHONY BRISKI, and RICK HOLLISTER (nominal defendant)

Defendants.

OPINION and ORDER

24-cv-541-jdp

---

Plaintiff Steven James Hoffmann, proceeding without counsel, alleges that officers with the Eau Claire and Menomonie police departments used excessive force by shooting him with a less-than-lethal impact weapon, tasing him, and using a police dog on him. Hoffmann is proceeding on a Fourth Amendment excessive force claim for damages against defendants Lieutenant Wade Schlichting, Officer Anthony Briski, and Sarah A. Buelow-Miller. Buelow-Miller is the personal representative of the estate of Samuel J. Miller, a deceased officer who tased Hoffmann during the incident.

Defendants move for summary judgment. Dkt. 111 and Dkt. 128. The background facts are undisputed, and the use of force itself was captured on video. Hoffmann, after having fled police attempts to arrest him, held a machete to his throat and refused repeated commands to drop the knife and surrender before Schlichting shot him with a foam projectile. Miller then tased Hoffmann, and Briski deployed the police dog. All those uses of force occurred before the officers managed to secure the machete and subdue Hoffman. The undisputed facts strongly suggest that the use of force was objectively reasonable. But the court will decide the case on qualified immunity: Hoffmann has not met his burden to show that reasonable officers

in defendants' position would have understood that their use of force was violated clearly established law. I will grant the defendants' motions and close the case.

## UNDISPUTED FACTS

I will treat Hoffmann's briefs in opposition, responses to defendants' proposed facts, and other summary judgment materials signed under penalty of perjury as declaration testimony, provided that the statements are based on his personal knowledge. But if a party's declaration testimony is directly contradicted by the video evidence, I will accept facts shown in the video as undisputed. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). I will also take judicial notice of the docket sheet in Hoffmann's related state criminal prosecution, Eau Claire Case No. 2024CF477.[1] With that background, the following facts are undisputed except where noted.

### A. Initial surveillance of Hoffmann and vehicle pursuit

On May 18, 2024, at night, Hoffmann was a passenger in his vehicle, which a woman was driving. Officer Conor Beres of the Eau Claire Police Department (ECPD) stopped the vehicle. *See* Dkt. 123 ¶ 4; Dkt. 135 ¶¶ 14, 16. Defendants say that Beres was following the vehicle because: (1) it had left a known drug house that he was surveilling; (2) the vehicle was involved in a retail theft; and (3) Hoffmann had a probation warrant. Dkt. 135 ¶¶ 7, 9, 10. Hoffmann says that he had not stolen anything and that the vehicle wasn't involved in a traffic offense when Beres stopped it. Dkt. 123 ¶ 4; Dkt. 138 ¶ 6. Hoffmann also says that Beres was

---

[1] https://wcca.wicourts.gov/case.html.

working with the woman in the vehicle to "entrap" him. Dkt. 121 ¶¶ 9–10. But Hoffmann does not directly dispute that he had a probation warrant. *See* Dkt. 145 ¶ 8.

During the stop, Hoffmann moved to the driver's seat and sped away. Dkt. 135 ¶¶ 16–17. A high-speed chase involving several law enforcement agencies ensued. *Id.* ¶ 18.

At 1:36 a.m., an officer for the Menomonie Police Department (MPD), defendant Miller, responded to I-94 near exit 45 to assist with the pursuit of the vehicle, which was traveling near 100 mph. Miller and MPD Officer Tyson Kahl used spike strips to disable the vehicle. Hoffmann then crashed near the Highway 41 exit on I-94, after which he and the woman fled on foot. *See* Dkt. 145 ¶ 13.

**B. Foot escape and initial standoff with Officer Miller**

Miller started looking for Hoffmann and the woman in the area west of Highway 25, near the intersection with Cedar Falls Road. During the search, Miller was informed by dispatch of a possible burglary in progress at E4447 Highway 12. Dkt. 135 ¶ 28; Dkt. 145 ¶ 14. Hoffmann says that he was simply knocking on doors to try to get help. *See id.*

Shortly after 2:00 a.m., Miller reached that area and saw a man, later identified as Hoffmann, walking from a field into a residential yard at E4480 Highway 12. Hoffmann was experiencing "drug-induced psychosis." Dkt. 145 ¶ 20. Hoffmann swallowed a bag of heroin after the vehicle pursuit, and he had used heroin and methamphetamine before the pursuit. *Id.* ¶ 19. Hoffmann was on "an eight-day bender of methamphetamine and heroin without eating." *Id.*

The ensuing events were captured on the officers' body-worn cameras.

Miller noticed that Hoffmann had a large, machete-style knife whose blade was about 6.6 inches long. The video shows that Miller identified himself as a police officer and told

Hoffmann, who was standing in a driveway, to raise his hands. Dkt. 114-2 (17:04–06). Miller continued to ask Hoffmann to raise his hands, but he answered "no," stating that he was holding a "knife to his throat." *Id.* (17:19–24). Miller ordered Hoffmann to drop the knife. *Id.* (17:24–25). As Miller slowly approached Hoffmann, he continued to refuse to drop the knife and get on the ground, and he said that he would kill himself. *Id.* (17:39–18:03). Miller radioed to other officers to "get less lethal," referring to a 40mm foam baton launcher. *See id*. (18:03–04); Dkt. 135 ¶ 46. This impact weapon "delivers kinetic energy that temporarily incapacitates an individual through blunt force." Dkt. 116 ¶ 6. Hoffmann continued to threaten to kill himself and to refuse to drop the knife. *Id.* (18:10–36).

Other officers soon began to arrive on the scene. *Id.* (18:38–47). Miller told an officer that Hoffmann had a machete. *Id.* (18:45–48). As the officers slowly approached Hoffmann with their guns drawn, he threatened to kill himself and overdose, and he said that he needed to go to the hospital. *Id.* (18:52–19:06). Hoffmann refused an officer's command to "come here," and Miller requested a "40," referring to a baton launcher. *Id.* (18:53–57).

**C. Arrival of Lieutenant Schlichting on the scene and use of baton launcher**

MPD Lieutenant Schlichting, who had recently arrived, said that he was coming with the baton launcher. Dkt. 116-1 (11:38–41). As Schlichting joined the officers, Hoffmann again said that he was going to overdose. *Id.* (11:48–49). Miller told Hoffmann to put the machete down, but he continued to hold it to his throat. *Id.* (11:51–56).

Schlichting said that the baton launcher was ready, and Miller told him to shoot Hoffmann with it. *See* Dkt. 114-2 (19:09–10). Schlichting then said "less lethal" twice and shot Hoffmann, striking him in his center torso. Dkt. 116-1 (11:56–58); Dkt. 145 ¶ 22. Hoffmann

cried out and started to hunch over, soon falling to his knees. Dkt. 116-1 (11:59–12:03). Hoffmann was in front of a parked sedan, which was next to a large pickup.

As the officers approached Hoffmann, he stayed on his knees, with his torso bent forward. *Id.* (12:05–11). The officers ordered Hoffmann to show his hands and drop the knife. *Id.* (12:07–11). Hoffmann raised his torso momentarily. *Id.* (12:12–13). He was holding a black object in his left hand; the position of his right hand is not clear from the video. *See id.* At that time, an officer twice said, "He has a machete." *See id.* (12:14–17). Another officer then said, "Sheath." *Id.* (12:17).

**D. Officer Miller's use of taser**

Meanwhile, after Schlichting fired the baton launcher, Miller said that he was "going to taser." Dkt. 114-2 (19:18–19). Miller and another officer went around the far side of the pickup, approaching Hoffmann from behind as the other officers approached him from the front. *Id.* (19:19–30). When Miller was behind Hoffmann, he had bent his torso forward again after having momentarily raised it. *Id.* (19:30–32). Hoffmann's arms were tucked under his torso so that his hands were not visible. *Id.* (19:33).

Miller said "taser" twice and tased Hoffmann for approximately five seconds, striking him in the upper back and waistline. *Id.* (19:34–38); *see* Dkt. 145 ¶¶ 28–29. The impact of the taser caused Hoffmann to cry out, and it briefly propelled him into a prone position with his left arm behind his back and right arm tucked under his torso. Dkt. 114-2 (19:34–37).

Miller approached Hoffmann and kicked a large black sheath out of his left hand. *Id.* (19:36–38); *see also* Dkt. 115-1 (20:45–47) (showing that the black object next to Hoffmann is a sheath, not a knife). At that time, an officer twice asked, "Where's the knife?" Dkt. 114-2 (19:36–38). Miller said that he couldn't see it. *Id.* (19:38–39).

Hoffmann then rolled onto his right side, flailing his arms and kicking his legs. *Id.* (19:39–42). The knife, which was on the ground, briefly came into view, but Hoffmann quickly covered it again with his leg and foot. *Id.* (19:41–42).

**E. Arrival of Officer Briski and use of police dog**

Meanwhile, Briski had arrived on the scene. Dkt. 129-4 (21:02). Briski reached the group with his police dog when the officer twice said, "He has a machete." *Id.* (22:00–01). Miller then, as recounted above, tased Hoffmann. When Hoffmann was prone after being tased, Briski moved the dog within a few feet of Hoffmann. *Id.* (22:05–10). At that time, the officer twice asked, "Where's the knife?," and Miller said that he didn't see it. *Id.* (22:05–08).

Right after Hoffmann's kicking legs briefly revealed and then covered the knife, Briski commanded his police dog to bite and hold Hoffmann. *Id.* (22:09–18); *see* Dkt. 145 ¶ 34. Briski says that the police dog is used to subdue a suspect and gain compliance when he is resisting, and that it is trained to bite a non-vital area of the body and hold until instructed to release. Dkt. 129 ¶ 8. The dog initially bit Hoffmann on his left arm, causing him to roll on his left side. Dkt. 129-4 (22:11–13); Dkt. 114-2 (19:42–45). The dog continued to bite Hoffmann on what appeared to be his lower back, eventually settling on his right arm. Dkt. 114-2 (19:48–59). After Hoffmann rolled on his left side, the knife came into view. Dkt. 129-4 (22:14–15). Briski told Miller to get the knife and Miller kicked it away. *Id.* (22:15–17).

An officer said, "All right. He's unarmed. He's unarmed." *Id.* (22:17–18). Briski and other officers called for Hoffmann to be handcuffed. *Id.* (22:19–21). An officer then told Briski, "I've got 'em," apparently meaning that he had Hoffmann under control. *See id.* (22:23–24). Briski commanded his police dog to stand still and he pulled it off Hoffmann. *Id.* (22:26–28). Briski gave that command as two officers applied handcuffs to one of Hoffmann's wrists.

Dkt. 114-2 (19:57–20:00); Dkt. 145 ¶ 43. The second handcuff was secured a few seconds later. Dkt. 114-2 (20:00–06). The total bite time was around 17 seconds. *See id.* (19:42–59); Dkt. 129-4 (22:11–28).

**F. Provision of medical aid and injuries**

The officers gave Hoffmann Narcan, which prevented him from overdosing, and he was transported to the hospital by ambulance. Hoffmann says that defendants' force caused him: (1) bruising on his chest, lung, and side; (2) scarring on his side and arm; and (3) post-traumatic stress syndrome and emotional distress. Dkt. 120 at 2.

**G. Related state criminal prosecution**

After the vehicle pursuit and standoff, Hoffmann was charged with four felonies and one misdemeanor in the '477 case. The felony charges were for: (1) second-degree recklessly endangering safety; (2) attempting to flee or elude an officer; and (3) two counts of bail jumping. Hoffmann was also charged with misdemeanor obstruction. Hoffmann pleaded guilty to the first two charges, and the other charges were dismissed but read in at sentencing.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

**A. Preliminary matter**

I added MPD Chief of Police Rick Hollister as a nominal defendant to facilitate service of process on Miller's successor or personal representative. Dkt. 53 and Dkt. 60. Buelow-Miller, as personal representative of Miller's estate, later answered. Dkt. 73. I will therefore remove Hollister from the case.

**B. Excessive force claim**

Hoffmann is proceeding on an excessive force claim for damages against Schlichting, Briski, and Buelow-Miller, as personal representative of Miller's estate. *See* Dkts. 7, 39, 67. In his briefs in opposition, Hoffmann suggests new double jeopardy, due process, and "entrapment" claims. Dkt. 120 at 1; Dkt. 137 at 1. I will not allow this last-minute, unauthorized amendment to his claims, which would be unfairly prejudicial to defendants. *See Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017); *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). I will consider only Hoffmann's excessive force claim for damages.

Hoffmann suggests that the Eighth Amendment applies to his excessive force claim. *See* Dkt. 120 at 4; Dkt. 137 at 4–5. But Hoffmann was a free citizen when defendants used force on him, so I will evaluate his excessive force claim under the more favorable Fourth Amendment standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that courts analyze claims that police officers have used excessive force during arrests of free citizens under the Fourth Amendment's objective reasonableness standard).

**1. Legal standard under Fourth Amendment**

Whether the use of force during an arrest comports with the Fourth Amendment "depends on the objective reasonableness of the officer's actions, judged on the basis of the conditions the officer faced." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). To assess objective reasonableness, the court must consider all the circumstances, including: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Hoffman's injury, is not itself an element of an excessive force

claim, but it "is evidence of the degree of force imposed and the reasonableness of that force." *McAllister v. Price*, 615 F.3d 877, 882 (7th Cir. 2010).

When considering the totality of the circumstances, the court must consider that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *See Graham*, 490 U.S. at 397. Courts therefore "give considerable leeway to law enforcement officers' assessments regarding the degree of force appropriate in dangerous situations." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015). The constitutional inquiry is objective and does not consider the motives or intent of the individual officers. *Phillips v. Cmty. Ins. Corp.,* 678 F.3d 513, 520 (7th Cir. 2012).

**2. Merits of claim**

The undisputed facts strongly suggest that defendants' uses of force were objectively reasonable. On the the first factor, the severity of his crimes, Hoffmann had an active probation warrant, which gave Beres a lawful basis to stop his vehicle. Hoffmann led the police on a high-speed chase that involved several agencies and that required officers to deploy spike strips to disable his vehicle. Hoffmann then fled from the offices on foot. Hoffmann disputes that he tried to break into any houses. But he says that he was running from house to house at night, knocking on people's doors. This erratic behavior, considering his flight at night and active warrant, supported a reasonable suspicion that he was involved in serious criminal activity.

On the second factor, the threat posed, Hoffmann was behaving in a threatening, erratic, and uncooperative manner when Miller encountered him. Among other behaviors, Hoffmann was holding a machete to his throat, threatening to kill himself, and walking away from Miller. Dkt. 114-2 (17:53–18:18). Before Schlichting used the baton launcher, Hoffmann

had refused repeated commands to drop the knife, raise his hands, and get on the ground. Hoffmann, who was in a drug-induced psychosis after an eight-day bender, also said that he was going to overdose and needed to go to the hospital. A reasonable officer would have taken Hoffmann to present a serious danger to himself and others, warranting the use of significant force to respond to the threat. *Cf. Snukis v. Taylor*, 145 F.4th 734, 741 (7th Cir. 2025) ("Force is reasonable only when exercised in proportion to the threat posed . . . .").

Initially, Schlichting used a baton launcher, which is a high level of force on the use-of-force continuum. *See Jackson v. City of Madison*, 176 F.4th 1005, 1024 (7th Cir. 2026) ("[N]on-lethal rounds fall on the high-end of the spectrum of less-lethal force and . . . non-lethal force is not to be deployed lightly."). But the baton launcher was proportional to the danger posed by Hoffmann's threatening, erratic, and uncooperative conduct, and it did not quell the danger. The strike caused Hoffmann to fall to his knees into a bent-over posture, but his hands were not visible and the officers had yet to find the machete.

So when Miller tased Hoffmann, there was still reason to think that he might try to harm officers if they came closer, or harm himself. The baton launcher strike had hurt Hoffmann, causing him to fall to his knees, cry out, and moan. But a reasonable officer could believe that Hoffmann was still able to use the machete on a nearby officer or himself. *See* Dkt. 114-2 (19:15–32). In fact, he was holding a large sheath in his left hand before Miller tased him.

The circumstances continued to warrant the use of significant force. Briski deployed the police dog, and as Briski reached the group, an officer said that Hoffmann had a machete. Miller tased Hoffmann. An officer asked Miller where the knife was, but he said that he didn't see it. The situation was tense, uncertain, and fluid.

After he was tased, Hoffmann's kicking legs uncovered the machete, but only momentarily. It's unclear from the video whether Briski actually saw the machete in that moment, but that's immaterial because Briski could infer that the machete was still within Hoffmann's reach. *See* Dkt. 129-4 (22:08–11); Dkt. 129 ¶ 12. Use of a police dog to bite and hold a suspect is also a high level of force on the use-of-force continuum, *Becker v. Elfreich*, 821 F.3d 920, 926 (7th Cir. 2016), and force "becomes increasingly severe the more often it is used," *Phillips*, 678 F.3d at 529. But the undisputed facts show that Hoffmann "had been unresponsive to the other non-lethal uses of force by other officers." *See* Dkt. 129 ¶ 12. The danger persisted; the circumstances supported the continuation of significant force. After the dog bit and held Hoffmann, officers managed to secure the machete. Briski ordered the dog to stand still and pulled it away only seconds after an officer said that he was under control. The dog bit and held Hoffmann for around 17 seconds. Hoffmann does not describe serious injuries specifically from the dog. His physical injuries consist mainly of bruising and scarring.

The third factor in the use-of-force analysis, active resistance or flight, also supports the use of force, but it's less significant than the first two factors in this case. Hoffmann led the police on a high-speed chase, and he fled on foot after his vehicle was disabled. When Miller found him, Hoffmann was going from house to house, knocking on doors. Hoffmann's escape had ended at that point, and he was standing still when Schlichting used the baton launcher on him. Hoffmann contends that he was offering only passive resistance when defendants used force on him. But Hoffmann, who had recently fled from the police and was in a drug-induced psychosis, repeatedly failed to drop the machete, raise his hands, and get on the ground. After Schlichting used the baton launcher, Hoffmann offered more resistance by tucking his hands under his torso and flailing on the ground. In the circumstances, a reasonable officer could have

concluded that he continued to pose a danger and was not subdued until he was handcuffed. *See Williams*, 797 F.3d at 477–78, 480 (suggesting that an obviously unstable person who had a knife and was making threats was not merely passively resisting arrest despite being mostly motionless when he was tased).

For the reasons explained above, the undisputed facts strongly suggest that each defendant's use of force was objectively reasonable under the circumstances. But I need not decide whether, despite the undisputed video evidence, there is some way that a reasonable jury could find for Hoffman, because the defendants are entitled to qualified immunity.

**C. Qualified immunity**

Defendants contend that they are entitled to qualified immunity. Qualified immunity shields state actors from liability where their conduct does not violate clearly established constitutional rights. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620 (7th Cir. 2022). In resolving questions of qualified immunity at summary judgment, courts ask: (1) whether the facts, when taken in the light most favorable to the plaintiff, show that the defendant violated a federal right; and (2) whether the right was clearly established at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). I need not consider the first element if the right wasn't clearly established at the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). I'll take that approach here even though defendants have made a strong showing that their conduct was objectively reasonable.

"A right is clearly established where it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Stockton*, 44 F.4th at 620. In most cases, the plaintiff must identify a closely analogous controlling case finding the alleged violation unlawful, or at least demonstrate that there is a clear trend in persuasive authority

showing that "recognition of the right by a controlling precedent was merely a question of time." *Id.*; *accord Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). Hoffmann bears the burden of defeating defendants' claims to qualified immunity. *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021).

Hoffmann does not directly address the issue of qualified immunity. I take him to contend that defendants are not entitled to qualified immunity because he was only passively resisting arrest and was subdued when defendants used force on him. But Hoffmann provides only cursory citations to caselaw, and none of his cases presents similar facts to this case. Dkt. 120 at 4; Dkt. 137 at 4–5. Hoffmann hasn't identified caselaw that would defeat defendants' claim to qualified immunity.

When the incident occurred, the court of appeals had established two general principles relevant here: (1) police officers cannot use significant force on nonresisting or passively resisting suspects; and (2) police officers must discontinue force once suspects are subdued. *See Becker*, 821 F.3d at 928–29. But the application of the first principle would at least depend "on the fact that the suspect is indeed subdued." *See Jackson*, 176 F.4th at 1026. The undisputed facts here show that Hoffmann was not subdued until he was handcuffed; each use of force occurred before then. By the same token, the second principle would at least depend "on whether [Hoffmann] was passively resisting in the first place." *See id.* at 1026–27. But Hoffmann, armed with a machete, was "declining to follow instructions while acting in a [threatening, erratic, and uncooperative] manner," not merely behaving in a "docile and cooperative" manner. *See id.* at 1027. Even if Hoffmann's behavior did not technically qualify as active resistance, Hoffmann "cannot point to any case involving a dangerous, obviously unstable person in possession of a weapon, making threats, which would have put the officers

on notice that their conduct was constitutionally impermissible." *See Williams*, 797 F.3d at 480; *see also Davis v. City of Elgin*, 180 F.4th 1023, 1028 (7th Cir. 2026) (affirming grant of qualified immunity to officers who used impact weapon on suspect who had knives during a standoff and had made threats of harm to himself and others). I conclude that defendants are entitled to qualified immunity.

ORDER

IT IS ORDERED that:

1. Defendants' motions for summary judgment, Dkt. 111 and Dkt. 128, are GRANTED.
2. Nominal defendant Rick Hollister is to be removed from the case.
3. The clerk of court is directed to enter judgment and close the case.

Entered September 10, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge